UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 16-CR-0003-CVE |
| ) | |
| JOHN ELDRIDGE CONE, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion to Suppress Evidence (Dkt. # 15). Defendant John Eldridge Cone is charged with being a felon in possession of a firearm (count one), possession of a controlled substance with intent to distribute (count two), and possession of a firearm in furtherance of a drug trafficking crime (count three). Dkt. # 2. Defendant asks the Court to suppress all evidence seized following an encounter with Tulsa Police Department (TPD) Officer Peter Maher on November 29, 2015. Defendant argues that Maher was not in a position to observe the alleged traffic violation, and he argues that the encounter was not a traffic stop and that Maher was required to have probable cause to detain him. The government has filed a response (Dkt. # 24), and it requests that the Court deny defendant's motion to suppress. The Court held an evidentiary hearing on April 8, 2016, and both parties presented witness testimony and exhibits.

**I.**

On November 29, 2015 at about 10:30 p.m., Maher was on patrol near the intersection of Memorial Drive and East 41st Street in Tulsa, Oklahoma. Maher was driving south on Memorial Drive and he turned right on East 41st Street, and Maher observed a white Ford F-150 pickup truck either driving westbound on East 41st Street or turning west onto East 41st Street coming from the

north on Memorial Drive. Maher testified that he saw that the truck did not have a functioning tag light,[1] but he was able to note the tag number of the truck because he was driving through a well-lit intersection. He acknowledged that he was driving past the truck, but he testified that he looked over his shoulder and saw that the tag lights were not functioning. Maher watched the truck in his rearview mirror and he saw that it turned into the parking lot of the Studio 6 Motel. He testified that he put the truck's tag number into his computer, but it is unclear what he learned by running the truck's tag number. Maher turned his vehicle around and drove to the motel parking lot, and he located the truck in the motel parking lot. Maher drove past the vehicle and confirmed that it had the same tag number and non-functioning tag lights, and he parked near the motel office. Maher testified that about two minutes passed from when he observed a traffic violation and when he parked his vehicle at the motel parking lot. Maher described the area where the motel was located as a high crime area where he frequently patrolled. He had not made any felony arrests at the Studio 6 Motel, but he had made felony arrests at nearby motels.

    Maher approached the truck on foot and he knocked on the driver's side window. The driver, later identified as Cone, rolled down the window and Maher asked if the driver had been driving on East 41st Street. Cone responded in the affirmative. Maher informed the driver that the truck's tag lights were not functioning. The driver produced his driver's license and provided it to Maher. Maher asked the driver if he had been in trouble before and the driver said yes. Maher

---

[1]    Oklahoma law requires that a motor vehicle have a light illuminating its rear license plate and the Tenth Circuit has found that this type of traffic violation can provide reasonable suspicion to initiate a traffic stop. United States v. Rice, 483 F.3d 1079, 1081 (10th Cir. 2007). The Court also notes that Maher refers to a "tag light" in his testimony, but the vehicle in question actually has two tag lights. Many vehicles do have a single tag light and this does not detract from the credibility of Maher's testimony, but the Court will refer to "tag lights" in this Opinion and Order.

2

followed up this question by asking if the driver had been to prison and the driver said yes, and he claimed that he had been to prison for money laundering. Maher was on patrol alone in a high crime area and he asked these questions for the purpose of officer safety. Maher wanted to run a warrant check on the driver, and he asked the driver to step out of the vehicle for officer safety while he ran a warrant check. Maher described the encounter as "cordial" up to this point. As the driver stepped out of the truck, Maher saw the butt of a pistol sticking out from beneath the center console and he believed that it was a Ruger pistol, and Maher was approximately four feet away from the pistol. Maher told the driver to get on the ground, and the driver took a step forward and said "where." Maher repeated his instruction to the driver and the driver again failed to comply. Maher repeated his instruction to get on the ground a third time but he believed that the driver was preparing to flee, and he holstered his firearm in order to apprehend defendant. The driver did attempt to flee but Maher apprended him, and Maher escorted the driver back to the vehicle and placed him on the ground. There were other people in the motel parking lot and Maher was concerned about the possible destruction or removal of evidence from the vehicle.

Maher moved the pistol from under the center console to the middle of the driver's seat, but he did not immediately search the truck. He had called for backup when the foot pursuit of the driver began, and other officers arrived within a few minutes. TPD Officer Kristi Score testified that she arrived on the scene at about 10:30 p.m. and she initially checked on Maher and secured the truck. Score saw a pistol on the front seat and rendered the pistol "safe" by removing any ammunition from the pistol. She detected a strong odor of marijuana coming from inside the truck and the odor was stronger on the passenger side. Score saw a backpack and she believed that the

3

odor was coming from the backpack, and she opened the backpack. Score found methamphetamine, marijuana, plastic baggies, and a digital scale in the backpack.

At the evidentiary hearing, defendant called John Floyd, an investigator for the Federal Public Defender, and defendant's girlfriend, Tabitha Burns, as witnesses. Floyd testified that he examined the truck about a week before the evidentiary hearing (approximately four months after the night in question), and the tag lights of the truck were functioning. He took photographs, which were introduced into evidence, and the photographs appear to show that the tag lights of the truck are currently working properly. Burns testified the she picked up the truck from an impound lot about a week after defendant was arrested and defendant had told her that Maher claimed that the truck's tag lights were not working. She pulled over and checked the tag lights on the way home from the impound lot, but it was daytime and she could not tell if the tag lights were functioning. Burns testified that she took the truck to a mechanic named Leo located on Pine Street in Tulsa, and she dropped off the truck while she went to Walmart to buy new bulbs for the tag lights. When she returned from Walmart, the mechanic told her that the tag lights were working and the bulbs did not need to be replaced.

## II.

Defendant argues that any evidence seized on November 29, 2015 should be suppressed, because Maher did not actually observe a traffic violation and he had no basis to initiate an investigative detention of defendant. He also argues that Maher did not actually conduct a traffic stop when he allegedly observed a traffic violation, and the encounter in the parking lot of the Studio 6 Motel was a separate and unrelated encounter for which he needed probable cause to place defendant under arrest.

The Court must initially consider whether Maher had a valid basis to initiate a traffic stop and whether the length of the stop was reasonable. A traffic stop is treated as an investigative detention, and such a stop is governed by the standards set forth in Terry v. Ohio, 392 U.S. 1 (1968). United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). In determining the reasonableness of a traffic stop, a court must make two separate inquiries. The first is whether the police officer had a valid reason for initiating the traffic stop. United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Id. Second, a traffic stop must not become an unnecessarily lengthy detention, but must be limited in scope to the purpose of the initial traffic stop. Rice, 483 F.3d at 1083. A police officer may extend the length of the traffic stop for questioning beyond the initial purpose of the traffic stop only if the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning." United States v. Ramirez, 479 F.3d 1229, 1243 (10th Cir. 2007).

The Court must also consider whether the length of the traffic stop was reasonable under the second prong of Terry. An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation. See United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001). An officer may also "ask questions about the motorist's travel plans and authority to operate the vehicle," in addition to obtaining the relevant documentation, without exceeding the scope of an investigative detention. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006). Such questioning does not violate the Fourth Amendment as long as the questioning does not prolong the traffic stop. United States v. Villa, 589 F.3d 1334, 1339

(10th Cir. 2009); United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005).  Police must have reasonable suspicion that criminal activity is afoot to continue a traffic stop beyond the purpose of issuing a warning or citation for the traffic violation.  United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995).  Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity."  Ornelas v. United States, 517 U.S. 690, 696 (1996) (internal quotation marks omitted).  An "inchoate and unparticularized suspicion or 'hunch' is insufficient" to support reasonable suspicion.  United States v. Hall, 978 F.2d 616, 620 (10th Cir. 1992) (internal quotations and citations omitted).  Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence."  Alcaraz-Arellano, 441 F.3d at 1260 (quoting United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)).  In determining whether an officer had reasonable suspicion of criminal activity, the Court does not evaluate the facts in isolation but instead construes them together based on the totality of the circumstances.  United States v. Arivizu, 534 U.S. 266, 274 (2002).

Defendant argues that Maher was not in a position to observe the tag lights on defendant's vehicle, because defendant's vehicle was headed in the opposite direction and Maher could not have seen the tag or tag lights on defendant's vehicle.  Maher testified that he was turning right onto East 41st Street and defendant's vehicle was either turning onto East 41st Street from northbound Memorial Drive or was headed west on East 41st Street.  Maher testified that he was able to see defendant's tag by looking over his shoulder, and that the intersection of East 41st Street and Memorial Drive was well-lit and Maher could clearly see defendant's tag.  The Court finds that Maher's testimony on this point is credible.  Maher acknowledged that he could not clearly recall from which direction defendant's vehicle was coming, but he testified that he has conducted

hundreds of traffic stops since November 29, 2015 and he does not recall all of the details of every stop. Maher's lack of recollection of this particular detail does not detract from the credibility of his testimony that he was in a position to observe the tag of defendant's vehicle when Maher turned right onto East 41st Street. Maher did have to look over his shoulder to observe a traffic violation, but he was on patrol and it is reasonable to believe that he was closely observing vehicles he encountered while on patrol. The Court finds that Maher was in a position from which he could have observed the truck's tag and tag lights as Maher turned onto East 41st Street.

Defendant next argues that the tag lights on his truck were functioning properly at the time of the traffic stop, and defendant argues that he did not actually commit a violation of state or local law that could have provided the basis for a traffic stop. Defendant presented the testimony of an investigator, Floyd, who examined the truck four months following the incident, and Floyd testified that the tag lights were working when he inspected the truck. Floyd took photographs of the truck and the tag lights, and some of the photographs were admitted into evidence at the suppression hearing. The photographs appear to show that the tag lights were functioning, but the photographs were taken in the daytime and the tag lights appear somewhat dim. In any event, the recent inspection and photos do not tend to prove or disprove that the lights were functioning four months earlier.

Defendant's girlfriend, Burns, testified that she picked up defendant's truck about a week after defendant was arrested, and she could not tell during the daytime if the tag lights were working. She took the truck to a mechanic and went to purchase new bulbs for the tag lights, but when she returned the mechanic told her the tag lights were working. None of the evidence presented by defendant concerns the condition of the truck at the time of the traffic stop, but Burns' testimony

suggests that she did nothing to alter or repair the truck and that the tag lights could have been functioning on November 29, 2015. Maher testified that he clearly observed that the tag lights of the truck were not functioning when he initially saw the vehicle in the intersection of East 41st Street and Memorial Drive, and he could see the tag number of the truck when he observed the violation. Maher subsequently located the truck in the Studio 6 Motel parking lot, identified the truck based on its color and tag number, and confirmed the tag lights were not working.

The Court finds that Maher had reasonable suspicion to believe that he had observed a traffic violation and he had a valid basis to initiate a traffic stop of defendant's vehicle. The Court notes that there is no evidence contemporaneous with the encounter that contradicts Maher's testimony that the truck's tag lights were not functioning properly. Maher testified that defendant's truck did not have functioning tag lights and his testimony was not equivocal. Floyd's testimony shows that the tag lights were working properly four months later, and Burns' testimony raises a question as to whether Maher was mistaken as to whether he actually observed a traffic violation on November 29, 2015. Even if Maher were mistaken about whether the tag lights were malfunctioning, this would not necessarily establish that a constitutional violation occurred. An officer's belief that he observed a traffic violation, even if it is a mistaken belief, can still provide reasonable suspicion for a traffic stop. Heien v. North Carolina, 135 S. Ct. 530, 536 (2014); United States v. DeGasso, 369 F.3d 1139, 1144 (10th Cir. 2004). However, the officer's mistaken belief that he had a basis to initiate a search or seizure under the Fourth Amendment must be reasonable. Heien, 135 S. Ct. at 536. The Court finds Maher's testimony to be credible to the extent that he believed that he had observed a traffic violation, and the evidence produced by defendant does not detract from the reasonableness of Maher's belief. Maher's testimony shows that he sincerely believed that he had observed a traffic

8

violation. Defendant's evidence shows that the tag lights could have been working when Burns picked up the truck from the impound lot, but even Burns attempted to ascertain if the tag lights were working after picking up the truck and she could not determine if the tag lights were working. She testified that she purchased new bulbs for the tag lights before a mechanic allegedly told her the tag lights were working, but the fact that she purchased new bulbs tends to show that it was difficult to determine if the lights were working. Even assuming that the tag lights were technically functioning, the evidence supports a finding that a person looking at defendant's truck could not clearly tell that the tag lights were on and Maher could have reasonably been mistaken as to whether the truck's tag lights were functioning on November 29, 2015. The evidence supports a finding that Maher's belief that a traffic violation had occurred was reasonable, even if mistaken in fact, and he had reasonable suspicion that defendant had committed a traffic violation.

Defendant argues that Maher's encounter with defendant in the motel parking lot should not be treated as a traffic stop, because the alleged traffic violation was temporally removed from the encounter and Maher never activated the emergency lights on his patrol car before making contact with defendant. Defendant claims that the encounter was more like an arrest than a traffic stop, and he argues that Maher did not have probable cause to believe that defendant had committed a crime. However, the evidence does not support defendant's argument. Maher testified that approximately two minutes passed from the time he observed the traffic violation to when he approached defendant's truck. This is a brief period of time and there was no break in the connection between Maher's observation of the traffic violation and Maher's encounter with defendant in the motel parking lot. Defendant argues that Maher did not activate the emergency lights on his patrol car before approaching defendant's truck. Defendant also argues that he was legally parked in the motel

parking lot and he was never pulled over by Maher, and the encounter more closely resembled an investigation than a traffic stop. It is true that most traffic stops occur on the road and police are required to use emergency lights to alert a driver to pull over to allow a police officer to conduct an investigative detention, but there is no authority suggesting that a traffic stop must occur in this fashion. Maher believed that he had observed a traffic violation and he approached defendant's truck with the intention of investigating that violation. Maher needed only reasonable suspicion, not probable cause, to initiate such an encounter with the driver of the vehicle that he reasonably believed had committed a traffic violation.

Defendant's motion to suppress and his arguments at the hearing suggest that he is challenging the warrantless entry into his vehicle after he was taken into custody by Maher. In his closing argument at the suppression hearing, defendant cited Arizona v. Gant, 556 U.S. 332 (2009), and he challenged whether police could have conducted a search incident to arrest of defendant's truck. In Gant, the Supreme Court clarified that a search incident to arrest of a vehicle cannot be conducted every time the recent occupant of a vehicle is arrested, but police must have a reasonable belief that "evidence relevant to the crime of arrest might be found in the vehicle." Id. at 343. The government argues that police had probable cause to search the vehicle after defendant was secured by Maher and this was not a search incident to arrest. "Probable cause to search a vehicle is established if, under the totality of the circumstances there is a fair probability that the car contains contraband or evidence." United States v. Jurado-Vallejo, 380 F.3d 1235, 1238 (10th Cir. 2004). A search warrant is generally not required for a vehicle search if police have probable cause. United States v. Mendoza, ___ F.3d ___, 2016 WL 1169102, *6 (10th Cir. Mar. 25, 2016). Maher had a valid basis to conduct a traffic stop, and he asked defendant if he had been in trouble and if he had

been to prison. Defendant responded "yes" to both questions, and Maher asked defendant to step out of the vehicle. When defendant was exiting the vehicle, Maher observed a firearm in plain view and he ordered defendant to get on the ground. Defendant attempted to flee from the scene and Maher subsequently apprehended defendant. Based on defendant's answers to questions, Maher had reason to believe that defendant was a prohibited person who could not possess a firearm, and defendant attempted to flee when Maher observed the firearm in the vehicle. These facts could lead a reasonable person to believe that defendant was engaged in a criminal act by unlawfully possessing the firearm and that the firearm was contraband or evidence of a crime. Even if this did not rise to the level of probable cause, Maher could have conducted a protective search of the vehicle's passenger compartment if he had a reasonable belief that the suspect posed a danger to police officers. United States v. Dennison, 410 F.3d 1203, 1210 (10th Cir. 2005). A weapon in plain sight would provide a sufficient basis to conduct a protective sweep to at least secure the weapon. See Gant, 556 U.S. at 348 (affirming that Michigan v. Long, 463 U.S. 1032 (1983), is still good law and that Long allows an officer to conduct a protective sweep of a vehicle if a police officer has reasonable suspicion that a person might access the vehicle to gain control of a weapon). Probable cause to conduct a further search of the vehicle after recovery of the firearm was established when Score detected an odor of marijuana coming from the passenger compartment of the vehicle while she was securing the pistol. United States v. Downs, 151 F.3d 1301, 1303 (10th Cir. 1998) ("The odor of marijuana alone can satisfy the probable cause requirement to search a vehicle . . .").

      The government also argues that the firearm and drugs would have been recovered during an inventory search of the vehicle, and the evidence would have inevitably been discovered even if probable cause was lacking for the search following defendant's attempt to flee. "The inevitable

discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation would have discovered it." United States v. Martinez, 512 F.3d 1268, 1273-74 (10th Cir. 2008).  To avail itself of the inevitable discovery rule, the government must show by a preponderance of the evidence that the evidence would have been discovered without a Fourth Amendment violation.  Id.  The government claims that TPD has a standard policy to conduct an inventory search of all vehicles impounded following the arrest of a suspect.  An inventory search of an impounded vehicle is a recognized basis for application of the inevitable discovery doctrine.  United States v. Martinez, 512 F.3d 1268, 1273-74 (10th Cir. 2008); United States v. Haro-Salcedo, 107 F.3d 769, 773 (10th Cir. 1997).  The government has produced a copy of TPD's vehicle search policy and, pursuant to that policy, an inventory search was actually conducted in this case.  Dkt. # 24-1; Dkt. # 24-2.  The evidence would have inevitably been discovered during the inventory search, and the inevitable discovery doctrine is applicable to this case.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence (Dkt. # 15) is **denied**.

**DATED** this 13th day of April, 2016.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE